## VEAL v. HOPPS et al.
## PASELL v. OLIVE et al.

Nos. 28163, 28164.   May 17, 1938.

Rehearing Denied June 14, 1938.

John Brett, for plaintiffs in error.

Howard B. Hopps, J. Walker Field, A. D. Erdberg, and Frank J. Wiley, for defendants in error.

HURST, J.   These are actions seeking permanent injunctions to enforce an agreement to restrict the lots in a certain block in Oklahoma City from the sale, lease, or gift to persons of African descent. The cases were consolidated and tried together by the court below and are presented together in this appeal.

The plaintiff in each case is the owner of lots in block N, Oak Park Addition to Oklahoma City. The block consists of 40

lots.. In the year 1926, the residents of the block circulated a contract providing that "no one of us, his or her heirs, executors, administrators, or assigns will ever sell, lease or give away any real property in said block or any interest therein to any person or persons of the Negro or African race, or to any corporation the majority of whose stockholders are of Negro blood." The contract further provided:

"This contract shall take effect and be in full force when executed by the owners of nine-tenths of the lots in said block, and may then be placed on record; and shall continue in force for a period of ninety-nine years from the date of said filing."

The contract was signed by persons purporting to be the owners of 37 lots in the block and was placed of record on October 14, 1926. On February 19, 1936, the defendant Freda C. Hopps, owner of lots 23 and 24, executed a contract of sale of said lots with an apartment house thereon, to the defendant Steve Bennett, a Negro. Steve Bennett in turn leased the premises to defendant Lizzie Cauley, a Negro. It is admitted that on June 20, 1936, the date of the violation as alleged in plaintiff's petition in the Veal suit, the Negro defendants were occupying the premises. In the William Pasell suit, other lot owners were made defendants under the allegation that they were threatening to sell or rent to Negroes. The defense set up in the pleadings and relied on at the trial was that the contract had not been signed by the owners of nine-tenths of the lots in the block, and thus by its own terms the contract never became effective and binding. The trial court sustained demurrers to plaintiffs' evidence upon this theory and rendered judgment in favor of defendants. The plaintiffs bring this appeal.

■ The plaintiffs, seeking reversal, present eight propositions, most of which, however, deal with the principal question in this case: Did the **owners** of nine-tenths of the lots in the block in question sign the contract so as to make it effective according to its terms? The trial court, as disclosed by the journal entry of judgment, found that because some of the persons who signed as owners of the 37 lots were not in fact the owners, or were owners of only a fractional interest therein, the contract had been signed by the owners of only approximately 30 lots in the block. To constitute nine-tenths, the contract required the signature of the owners of at least 36 lots. It appears from exhibits attached to the pleadings that during the month of July, 1936, after the date of the alleged breach of the agreement, the purported owners of the three lots not included in the original contract signed copies of the instrument. But there is no contention in this appeal that these signatures rendered the contract retroactive in its effect as against the defendants. As to the remaining approximately seven lots which the trial court found absent from the agreement, we will consider the separate questions raised as they are grouped together in the briefs.

(a) The trial court found that Mrs. G. C. Meis signed the contract as owner of one and one-half lots when in fact she was the owner of only a one-third interest, thus leaving one lot in which she had no interest. It was stipulated that G. C. Meis became the owner of this property in 1922, and died in 1925 leaving as heirs, his widow, Mrs. G. C. Meis, and two minor children. The widow signed the original contract, but the children who inherited an interest in the premises did not sign. The trial court further found that the contract was signed by Mrs. Florence Anderson as the owner of two lots, when in fact she was the owner of only a one-third interest, thus leaving one and one-third lots in which she had no interest. In this connection it was stipulated that S. T. Anderson acquired these lots in 1919 and upon his death in 1923 the property was distributed, one-third to his widow and the remainder to his three minor children. In 1924 the American National Bank was appointed guardian for the children and remained as guardian until after the execution of the contract. The contract was signed by the widow as an individual in 1926, and neither the children nor their guardian signed. Regarding the three and one-half lots purported to be owned by these widows, the plaintiffs contend that the widows had authority to sign the contract and bind the entire property on the theory that the property was a homestead. It is argued that "a widow, with a life estate in a homestead, is entitled to and required by law to use measures necessary to protect the same, and has the right to encumber her estate therein."

In Christie v. Lyons (1935) 173 Okla. 158, 47 P.2d 128, construing a contract identical in all material respects to the one involved in the instant case, the court held that "restrictions and prohibitions of the use of real property are not favored in the law, and the terms of such covenants will not be enlarged by implication, but confined to their accepted usage and the clear intention of the parties expressed therein." This

is the settled rule of construction in this state regarding restrictive covenants. See Test Oil Co. v. La Tourette (1907) 19 Okla. 214, 91 P. 1025; Vaughn v. Lyon (1927) 122 Okla. 179, 252 P. 1088; Cooke v. Kinkead (1936) 179 Okla. 147, 64 P.2d 682; Southwest Pet. Co. v. Logan (1937) 180 Okla. 477, 71 P.2d 759. The contract by its plain terms provides that the **owners** of nine-tenths of the lots in the block must sign the contract before it becomes effective. This is a condition precedent to its enforcement. Christie v. Lyons, supra. It is apparent from the evidence that the widows were not the owners of two and one-third lots for which they purported to sign. We cannot agree with the argument of plaintiffs that they had authority to bind the entire premises in question by reason of a homestead interest. There is no evidence to substantiate the assertion that the premises were occupied as a homestead. The record is silent on this point and we are not at liberty to infer that such is the case.

In regard to the Meis property, the record discloses that on July 30, 1936, Mrs. Meis, as guardian for her two children, filed an application in the county court and acquired an order the same day authorizing her, as guardian, to execute the contract on behalf of her children. Plaintiffs argue, as one of their propositions, that "the county court had authority to authorize Mrs. Meis to bind the property of her wards." Under the facts of this case it is not necessary to determine this question. These signatures were acquired ten years after the original contract was recorded, and a month after the breach was alleged to have occurred. If there was not a concurrence of owners of nine-tenths of the lots in executing the agreement at the time it was recorded, it did not become effective, and signatures acquired an unreasonable length of time thereafter, and after the breach, can have no effect in this controversy. See Schefer v. Ball (1907) 104 N. Y. S. 1028, cited in Christie v. Lyons, supra. We are not unmindful that the contract contains the following provision:

"* * * and any and all other lots in said block may be brought under this agreement subsequently, the execution thereof by the owners of such lots bringing them under all the obligations and entitling them to all the privileges of the first signers thereto."

But this provision contemplates that the contract must have received sufficient signatures to make it effective in the first instance.

(b) The trial court found that two other persons signing as owners of four lots had no authority to bind a portion of the premises sought to be covered. Plaintiffs argue that they had authority to sign as executor or administrator, and make a further proposition in this connection that since the estates for which they acted were closed, their acts would not be subject to collateral attack. It is not necessary to discuss these contentions of plaintiffs, for the reason that from what we have already said regarding the other lots, the contract did not receive the signatures of the owners of the required number of lots. The contract when recorded contained the signatures of the purported owners of 37 lots. As pointed out above, the owners of two and one-third of those lots did not sign. The contract, therefore, contained only the signatures of the owners of 34⅔ lots, which was not sufficient even conceding plaintiffs' argument in this connection to be correct.

(c) The trial court found that two other persons signed as owners of two lots when in fact they owned but a fourth interest in said lots. The argument of plaintiffs in this connection pertains to all the owners and requires special attention. Plaintiffs contend that the owners of all the lots in the addition accepted the benefits of the contract and by the doctrine of equitable estoppel cannot now be heard to challenge its validity. There is no contention of acquiescence by the owners of lots who did not sign the agreement, and we do not think the authorities and argument presented by plaintiffs can have any application here. Because of the failure to secure the signatures of the owners of nine-tenths of the lots, the contract never became effective. Neither defendants nor their predecessors received any benefit from the restriction for the reason that no one was bound by it. Therefore, whatever benefits accrued to defendants by the exclusion of Negroes from the block for ten years did not arise by virtue of the contract. It was purely a voluntary exclusion. See Schefer v. Ball, supra.

2. Plaintiffs contend that the contract is not in violation of the federal or state Constitutions, and also that the original purpose for which the contract was executed can still be accomplished. But such matters are in anticipation of defenses not relied on by defendants, and it therefore becomes unnecessary to consider them here.

Because of the failure of the contract to contain the signatures of the owners of the

required number of lots, the trial court was correct in sustaining the demurrers of defendants. Judgment affirmed.

BAYLESS, V. C. J., and WELCH, PHELPS, CORN, and GIBSON, JJ., concur. OSBORN, C. J., and RILEY and DAVISON, JJ., absent.