### COOKE v. KINKEAD et al.

No. 27459.    Opinion Filed Dec. 1, 1936.

Rehearing Denied Jan. 9, 1937.

Application for Leave to File Second Petition for Rehearing Denied Feb. 2, 1937.

**148**

Shirk, Danner & Earnheart, Charles Swindall, and J. H. Jarman, for plaintiff in error.

Abernathy & Howell and C. H. Hale, for defendants in error.

OSBORN, V. C. J., This action was instituted in the district court of Oklahoma county by Charles B. Cooke, hereinafter referred to as plaintiff, against John B. Kinkead, and numerous other defendants, including Knox L. Garvin, in which it was sought to enjoin and restrain said Knox L. Garvin from drilling and exploring for oil and gas upon block 9, Howe's Capitol addition to Oklahoma City, or from assigning his lease to any other person, firm, or corporation, and to enjoin the other defendants as property owners in said block from placing any oil and gas leases on record in the office of the county clerk of Oklahoma county. Injunctive relief was denied by the trial court, and plaintiff has appealed.

Plaintiff alleges that he is the owner and in possession of the west 52½ feet of lot 10 in block 1 in Howe's Capitol addition to Oklahoma City, upon which he has erected valuable improvements in compliance with the plat restrictions and covenants of said addition; that various defendants named in the petition are the owners of real estate in block 9, of said addition; that said defendants have leased the lots owned by them in said block 9 to the defendant Knox L. Garvin for the purpose of drilling and exploring for oil and gas. It is alleged that the defendant Knox L. Garvin, unless enjoined, will go upon said premises, with the permission of the respective owners of the lots, dig cellars and slush pits and erect boilers with smokestacks, install steam engines and drilling machinery and equipment and drill an oil and gas well thereon and will erect thereon storage tanks therefor and lay pipe lines under, through, and across the streets and alleys, and that noises and noxious and vexatious odors from said operations and oil and gas wells and the carrying on of said operations will destroy the property of plaintiff and the property generally throughout said platted area for residential uses and purposes, being the purpose for which said land was laid out and platted and restricted. It is to be noted that the property of plaintiff is located in block 1 of said addition, whereas the proposed operation relates to block 9 of said addition, and by reference to the recorded p'at it appears that the property of plaintiff is located some four blocks distant from said operations.

Plaintiff alleged in his petition, and asserts in his argument herein, that on January 18, 1919, a plat of various blocks of said addition was filed by the then owners thereof containing, among others, the following restrictions:

"Any person, or persons, hereinafter becoming the owners of any tract or parcels hereby platted, shall take and hold the same subject to the following conditions, and restrictions, to-wit: * * *

"Fourth: Only one residence shall be erected on any building site in blocks one (1), four (4), five (5); eight (8), nine (9), twelve (12), or nineteen (19), and all owners are required to face their dwellings south on lots facing south, and north on lots facing north, but this does not preclude side entrances when desired. And no building in blocks one (1), four (4), five (5), eight (8), nine (9), twelve (12), or nineteen, shall ever be used or occupied except for that of residence exclusively, and no intoxicating liquors shall ever be manufactured or sold, nor shall any house of prostitution be permitted, in the addition."

Plaintiff alleged and asserts herein that said Capitol addition, for more than 10 years, has been built up and improved as a residential district in substantial compliance with said plat restrictions, and that the drilling of an oil and gas well on block 9 would materially and substantially damage all of said property and practically destroy the same for residential purposes, and that the owners of property in said addition have long acquiesced in a common plan and scheme of occupying and using said property for residential purposes, and that the owners thereof, and their grantees, are in equity estopped to deny the uses and purposes for which such property has long been used and is useful, and that the drilling of an oil and gas well is contrary to the express and implied res'rictions set forth in said plat when construed in connection with such common plan and scheme.

Defendants assert that the restrictions contained in said plat do not prohibit the dri'ling of an oil and gas well; that at the time of the platting of said lands oil had not been discovered in their vicinity and that conditions have materially changed affecting the use of said area; that many oil and gas wells have been drilled and are being drilled in terri'ory surrounding said addition; that the existence of a large pool of oil and gas has been discovered under said proper'y and by reason of the migratory and fugacious nature of oil and gas, the same will be drained from under said property and the owners thereof will suffer heavy and irreparable loss and damage if plaintiff is granted injunctive relief.

It may be said at the outset that it is expressly conceded by the parties no question of nuisance is involved herein. Plaintiff also takes the position that in order to obtain the relief sought, while no direct pecuniary loss or damage will arise proximately from the operations by reason of the distance thereof from plaintiff's property, it is not necessary to show that he will sustain a pecuniary loss by the drilling of a well for oil and gas on block 9. The sole question, therefore, for our consideration in this case is whether or not drilling for oil and gas is prohibited by the plat restrictions which are hereinabove quoted.

The first proposition relied upon by plaintiff in support of his view is as follows:

"The dedication of an addition containing expressed restrictive covenants that uses be limited to residences exclusively, coupled with such circumstances surrounding the act of platting an area into blocks and lots that uses were intended to be thus limited, creates such a uniform plan and scheme as to development and the uses to which the property can be put, that no owner of lots in the addition can lawfully use the same for purposes other than the ones permitted."

In support of said proposition it is argued that in construing plat restrictions the entire document must be considered in order to determine, if possible, the intent of the dedicators, citing Bachman v. Colpaert Realty Corp. (Ind.) 194 N. E. 783. In this connection our attention is directed to various provisions found in the restrictions. The contention is that all of the language, when considered together, shows an intent on the part of the dedicators to restrict not only the **use of the buildings, but the use of the land itself.** It is further argued that we must take into consideration the circumstances surrounding the platting, and in this connection our attention is directed to the language contained in restrictive covenants as applicable to various other contiguous additions. The language used in some of the restrictive covenants in adjacent subdivisions is "no part of the land herein platted shall be used for other than residential purposes." In support of the proposition that we must give due effect to the circumstances surrounding the platting and the fact that the subdivision and surrounding territory has been built up as an exclusive residence district, we are cited to the cases of Library Neighborhood Association v. Goosen (Mich.) 201 N. W. 219; Melson v. Ormsby (Iowa) 151 N. W. 817, and DeLanley v. Van Ness, 193 N. C. 721, 138 S. E. 28.

Plaintiff contends that the only natural and plausible construction to be placed upon the language "and no building * * * shall ever be used or occupied except for that of residence exclusively," in view of the facts and circumstances in this case, is that **no lot** should ever be used or occupied except for that of residence exclusively. The argument of plaintiff and the authorities cited are not strictly applicable to the exact point at issue in this case. There are other legal principles involved to which we must give due consideration. We must give full force and effect to the provisions of section 9698, O. S. 1931, which provides as follows:

"Every estate in land which shall be granted, conveyed or demised by deed or will, shall be deemed an estate in fee simple and of inheritance, unless limited by express words."

In line with the legislative policy of construction declared by this provision of the statutes the authorities hereinafter quoted are pertinent and applicable.

"Where the language of a covenant is unambiguous, clear, and specific, the rule is similar to that adopted in the construction of statutes, that no room is left either for interpretation or construction." Lynch v. Commercial Casualty Ins. Co. (N. J.) 108 Atl. 188.

"The parties being deemed capable of expressing such contract as they desire to enter into, it is not the province of the courts, through the doctrine of implied covenants, to make a contract for them, but to effectuate the purpose of the contract they actually made." Wagoner Oil & Gas Co. v. Marlow, 137 Okla. 116, 278 P. 294.

"If the words convey a definite meaning, involving no absurdity or contradiction of other parts of the instrument, then that meaning apparent on the face of the instrument must be accepted, and the courts have no right to add to it or take from it." Makins v. Shellenbarger, 144 Okla. 58, 289 P. 716.

"Parties to a contract in writing are presumed to understand the plain provisions of their contract, and in the absence of fraud, mistake, or ambiguity, this court cannot read something into the contract that the parties themselves did not place therein. The rule is that competent parties make their own contracts and the courts will not make contracts for them, but will only enforce contracts which they themselves have made." Autry v. First Nat. Bank et al., 131 Okla. 279, 269 P. 286.

"If the language of a contract is such as to clearly show the intent of the parties, then there is no need to apply any technical rules of construction; for where there is no doubt,

there is no room for construction." Romans v. Shannon, 80 Okla. 199, 195 P. 298.

"Where the agreement between parties is reduced to writing and mutually signed, and where the consideration agreed upon is expressed in unequivocal language which is free from ambiguity, the obligee in the contract is estopped to insist upon a strained and unnatural construction of the language used in order to import a consideration more favorable to himself than that plainly expressed in the contract." Golden v. Golden, Adm'x, 155 Okla. 10, 8 P. (2d) 42.

In further support of said general policy of construction, see the following cases: Finerty Inv. Co. v. Athey, 89 Okla. 284, 215 P. 611; Goble v. Bell Oil & Gas Co., 97 Okla. 261, 223 P. 371; Mid-Continent Life Ins. Co. v. Skye, 113 Okla. 184, 240 P. 630; Breeding v. Ritterhoff, 126 Okla. 225, 259 P. 227; Shaw v. Grumbine, 137 Okla. 95, 278 P. 311; Woods v. Davis, 155 Okla. 6, 7 P. (2d) 905; Dawson v. Coppock, 169 Okla. 115, 36 P. (2d) 46; McCarty v. Lumry, 170 Ok'a. 156, 38 P. (2d) 937; Ci'y of Hobart v. Dailey, 170 Okla. 107, 39 P. (2d) 44.

"Covenants limiting the use of property must be construed strictly and not extended by implication." Samuel D. Moses et al. v. Melvin C. Hazen et al., 63 App. D. C. 104, 69 F. (2d) 842, 98 A. L. R. 386.

"Restrictions on the use of property, being in derogation of the fee conveyed, will not be extended by implication to include anything not clearly expressed; and doubts arising as to the intention of the parties must be resolved in favor of the free and untrammeled use of the land." Gardner v. Maffitt et al. (Mo.) 74 S. W. (2d) 604, 95 A. L. R. 452.

"Covenants restricting the use of real property are strictly construed in favor of the free and unrestricted use of such property. Due regard must be had for the purpose contemplated, as well as the circumstances surrounding the transaction, but in construing such a covenant the controlling factor is the expressed intent of the parties. Intent unexpressed will be unavailing, and substantial ambiguity or doubt must be resolved against the person claiming the right to enforce the covenants." Moore v. Stevens (Fla.) 106 So. 901.

"Courts of equity do not aid one man to restrict another in the uses to which he may put his land unless the right to such aid is clear." Jennings v. Baroff (N. J. Eq.) 144 Atl. 717, 60 A. L. R. 1219.

We find no substantial conflict in the authorities. As pointed out in the case of Matthews Real Estate Company v. National Printing & Engraving Co. (Mo.) 48 S. W. (2d) 911, 81 A. L. R. 1039, restrictions in conveyances will be strictly construed and

will not be extended by implication to anything not clearly expressed in them; and if there be ambiguity in the terms of the covenant or substantial doubt of its meaning, such ambiguity should be resolved, if possibly it can be, in favor of the use complained of. We will not burden this opinion with the citation of numerous cases from various jurisdictions cited and analyzed in the briefs. Suffice it to say that a very clear distinction runs through all the authorities. If there is ambiguity in the language used in restrictive covenants or substantial doubt as to its meaning, then the courts are justified in taking into consideration the circumstances surrounding the platting to determine, if possible, the intent of the dedicators, and where such intent is ascertainable by construing the restrictions as a whole and giving due consideration to other circumstances which cast light upon said intent, the same should be given effect. In the instant case there is no ambiguity in the language used. The language is clear and specific to the effect that no building shall ever be used or occupied for any purpose except that of residence exclusively. There can be no doubt as to the meaning of such language, In order to sustain plaintiff's contention in this case we would be compelled to distort the well-established meaning of words of common usage, and to extend such meaning by implication to situations unexpressed in the instrument. If there was an intention on the part of the dedicators to restrict the use of the land itself, such intention is unexpressed, and is unavailing in this case. Moore v. S'evens, supra. In so far as the land itself is concerned, there are no express words limiting its use, and to that extent the defendants who are landowners in the addition hold the same in fee-simple title, subject only to the restrictions on the use of buildings erected thereon. Sec'ion 9698, supra.

We will refer briefly to the former decisions of this court cited in the briefs which deal with covenants restricting the use of real estate. In the early case of Test Oil Co. v. La Tourette, 19 Okla. 214, 91 P. 1025, the court applied the rule of strict construction in dealing with a stipulation in a deed whereby the parties agreed that in any deed thereafter executed on any part of a certain town-site addition they wou'd prohibit any drilling for oil and gas thereon. The court held that the term "deed" did not include "lease," and that the parties were not prohibited from leasing the tract for the purpose of drilling oil and gas wells thereon.

In the case of Vaughn v. Lyon, 122 Okla. 179, 252 P. 1088, the court gave effect to a restriction upon a certain addition to the city of Tulsa providing that the **real estate** should "not be used for other than residence purposes" and enjoined the use of certain premises within the addition for hospital purposes. The issues involved in the recent cases of Van Meter v. Manion, 170 Okla. 81, 38 P. (2d) 557, and Commercial Realty Co. v. Pope, 171 Okla. 331, 43 P. (2d) 62, are entirely dissimilar to the issues involved herein.

We hold, therefore, that the use of the land for drilling an oil and gas well is not prohibited by the express terms of the plat restrictions and that injunctive relief was properly denied under the theory on which the cause was presented to the trial court.

The judgment of the trial court is affirmed.

BUSBY, WELCH, PHELPS, and CORN, JJ., concur. McNEILL, C. J., and RILEY, BAYLESS, and GIBSON, JJ., dissent.

McNEILL, C. J. (dissenting). This suit is brought to enjoin defendant's in error from drilling an oil and gas well on b'ock 9, Howe's Capitol addition to Oklahoma City, on the theory that the restrictive covenants applicable to said block deny such use for the reason that said block was restricted for residential purposes.

Chas. B. Cooke, plaintiff in error, plaintiff below, is the owner of improved property in the addition of which block 9 is a part, and alleges in substance that the defendant Knox B. Garvin is attempting to drill an oil and gas well upon said block and will dig cellars, slush pits, and erect steel boilers with smokestacks and other drilling machinery and equipment for the drilling of said well, and that by doing so will destroy the property of plaintiff and the property generally throughout the p'atted, restricted area known and designated as Howe's Capitol addition to Oklahoma City, for residential uses and purposes, being the purposes for which said land was laid out, platted, and restricted. It was also alleged that it was the intention of the common dedicators of said property and the common grantor of all said lots and all said blocks in said addition, which lots and blocks were sold, platted, and dedicated, that said property was to be used for residential purposes, and that all of the common grantees of said common grantors purchased said lots wi'h the common and mutual intention and understanding that each and every lot sold by said common grantor should be used and occupied by said grantees for residential purposes and that said plat contains in part the following restrictions:

"Any person or persons hereinafter becoming the owners of any parcel or tract hereby platted, shall take, hold the same subject to the following conditions and restrictions, to wit:

"Third. All buildings in the addition shall be of modern construction and in keeping with the surroundings. No residence north of the alley in block nine (9), shall cost less than four thousand ($4,000) dollars. No residence in the south half of block nine (9), and in the north half of block twelve (12), shall cost less than three thousand five hundred ($3,500) dollars. No residence in any part of the addition shall cost less than two thousand five hundred ($2,500) dollars. The company's agent, H. G. Eastman, shall have power, when making a sale, to increase the restrictions as to costs and to determine type of houses on any building site.

"Fourth. Only one residence shall be erected on any building site in blocks one (1), four (4), five (5), eight (8), nine (9), twelve (12), or nineteen (19), and all owners are required to face their dwellings south on lots facing south and north on lots facing north, but this does not preclude side entrances when desired, and no building in block one (1), four (4), five (5), eight (8), nine (9), twelve (12), or nineteen (19), shall ever be used or occupied except that of residence exclusively and no intoxicating liquors shall ever be manufactured or sold, nor shall any house of prostitution be permitted, in the addition." (C.-M. 5 to 11. inc.)

The original plat also contained in part a provision that, as appurtenant to each residence and to be used only in connection with it, a garage or servant's house, or any other subsidiary building, may be erected on said premises containing a residence.

The matter came on for trial before the district court of Oklahoma county, and plaintiff was denied injunctive relief. Appeal has been perfected to this court. The real controversy is whether the conditions and restrictions contained in the platting of the property inhibit the right of the defendant's to proceed under an oil and gas lease with the drilling for oil and gas on block 9 in said addition.

It is the theory of the plaintiff that the restrictive covenants limited the use of the b'ock to residential purposes exclusively, and that this excludes the drilling of an oil and gas well thereon. On the other hand,

the defendants contend that the restrictions contained in the platting do not prohibit the drilling of oil and gas wells in said addition even though it is a district of residences. It is also the contention of defendants that the drilling for an oil and gas well is only a temporary use which in no way will defeat the area as one for residential purposes.

In construing the restrictive covenants we must consider the term "building site." "Site" is defined by Hawkins' Mechanical Dictionary, being a cyclopedia of words, terms, phrases, and data used in the mechanical arts, trades and sciences, as follows:

"Site.—A locality or situation; the place whereon any building or collection of buildings has formerly stood, stands, or is intended to stand; the plot of ground where anything is to be built, made or done."

In Stroud's Judicial Dictionary, the term "building site" is defined as follows:

"Building Site.—Building site is land reasonably fit for building on at once. * * *"

In 9 Corpus Juris, 683, "building" is defined as follows:

"Building. A fabric built or constructed; an edifice for any use; an edifice erected by art and fixed on or over the soil, composed of brick, stone, marble, wood, or other proper substance connected together, and designed for use in the position in which it is so fixed. * * *"

Bouvier's Law Dictionary (Rawle's 3d. Rev.) p. 400, defines "building" as follows:

"Building. An edifice, erected by art, and fixed upon or over the soil, composed of brick, marble, wood, or other proper substance, connected together, and designed for use in the position in which it is so fixed. Every building is an accessory to the soil, and is therefore real estate; it belongs to the owner of the soil; Cruise. Dig. tit. 1, s. 46; but a building placed on another's land by his permission is the personal estate of the builder; 2 Bla. Com. 17."

Stroud also defines the word "reside" as follows:

"Reside.—1 15; 'The words "Residence," and "Place of Abode" (p. 1489), are flexible, and must be construed according to the object and intent of the particular legislation where they may be found. Primarily, they mean, the dwelling and home where a man is supposed usually to live and sleep; they may also include a man's business abode, the place where he is to be found daily (per Gibson, J., R. v. Fermanagh Jus., I. R. 510, 511). v. Resident Magistrate'."

In the case of Board of Education of Orange County v. Forrest et al., 130 S. E. 621, the Supreme Court of North Carolina, in construing a section of the statute which empowered the county board of education to acquire title to suitable sites, said:

"The meaning of the word 'site' as used in the statute is broad enough to embrace such land, not exceeding the statutory limit, as may reasonably be required for the suitable and convenient use of the particular building; the land taken for a playground in conjunction with a school may be as essential as land taken for the schoolhouse itself. 24 R. C. L. 582, section 31."

In the case of Myevre v. Liberty Realty & Securities Co., Inc., et al., 100 So. 694, the Supreme Court of Louisiana considered the term "building site" and held that it included the entire lot and not merely ground on which the building stood.

It does not appear questioned by the defendants that there was a common plan and purpose to dedicate the land in question for residential purposes. Defendants contend that the restriction, however, does not prevent the drilling of an oil and gas well on the premises in question. The purchasers of the lots in said block and the other blocks in said addition took title subject to the conditions and restrictions which were imposed by the dedicators. The plat provided that except in block 21, no residence in the entire addition should be erected on less than 50 feet of ground fronting on a street running east and west; that the buildings were to be of modern construction **and in keeping with the surroundings** and that the company's agent had the power when making a sale to increase the restrictions as to the costs **and to dictate the type of houses on any building site.**

The fourth restriction in the amended plat of said block specifically directs and requires that the owners shall face their dwelling south on lots facing south and north on lots facing north. On any building site there must not be erected more than one residence. The building site is the premises itself; the ground. The term "residence" means the dwelling or home where the owner makes his home, and no building under this restriction shall ever be used or occupied except that of residence exclusively, and it is to be observed that there can be no residence on less than 50 feet of ground fronting on a street running east and west. It is obvious that the terms "building" and "residence" are elastic and flexible terms and synonymously used. It cannot be said that this restriction imposes no restriction on the use of the land, not in the liberal sense, but under the rule of

strict construction. In fact, very positive restrictions are imposed; the building site can be used for no other purpose than for a residence, and that means that the land itself, not land immediately under the residence, but the building site must be devoted to a residence, a dwelling, a home, if anything is to be erected on said building site in said block. There is and can be no escape from the general plan that no building can be erected on a building site except for residential purposes. There can be no residence without the building site and it is perforce the building site which is completely designated and dedicated and restricted to the use of a residence and it is not the use of the residence which is restricted apart from the building site. The building site is for one residence and no building can be erected upon the building site, or the lot in question, except that such building be used exclusively for residence purposes. There is no ambiguity in the restrictions nor in the terms which have been used. The intent is plain, and it is obvious that the conditions were imposed upon the use of the tract in question for strictly residential purposes and the land was so dedicated for residential purposes and not for commercial interests or for the drilling of oil and gas wells thereon. Plaintiff and other residential owners purchased their building sites for residential purposes exclusively and plaintiff has a right to rely upon all purchasers complying with those restrictions. The express purpose was to establish a strictly residential district.

To permit the drilling of oil and gas wells against the teeth of these conditions, limitations, and restrictions, would be permitting the erection of oil and gas rigs on the ruins of another's right to protect his property for residential purposes only.

In interpreting plat restrictions, a court of equity, in granting or denying injunctive relief, must look beyond the mere printed restriction and view the attending and surrounding circumstances to ascertain the true intent and purpose of the original grantor in imposing such restrictions.

In the case of Library Neighborhood Association v. Goosen (Mich. 1924) 201 N. E. 219, the Supreme Court of Michigan considered the enjoining of the erection of an apartment building on certain lots in the city of Detroit which involved restriction covering sing'e residences. In that case the court held:

"Court of equity is bound to recognize and enforce mutual reciprocal rights created among purchasers of lots, under building restrictions imposed in pursuance of general building plan."

In the body of the opinion the court said:

"* * * We must look to the surrounding circumstances to discover the intention of the parties and the purpose of the original grantor in imposing the restriction.

" 'In dealing with this subject, equity does not concern itself with the form of the language in which the restriction is couched, but deals only with its substance. It disregards the inquiry whether it is a condition or a covenant, and enforces it when it was plainly intended by the parties that it should be for the benefit of the land held by the plaintiff.' Coughlin v. Barker, 46 Mo. App. 54, cited in note to Korn v. Campbell, 37 L. R. A. (N. S.) 18.

" 'It is always a question of the intention of the parties. * * * In order to make this rule applicable it must appear from the terms of the grant, or from the situation and surrounding circumstances, that it was the intention of the grantor in inserting the restriction to create a servitude or right which should inure to the benefit of the plaintiff's land, and should be annexed to it as an appurtenance.' Beals v. Case, 138 Mass. 138.

" 'In cases of this kind it is important to ascertain the purpose of the grantor in imposing the restrictions—whether they are intended for his personal benefit, or for the benefit of the lot owners generally. His intention is to be gathered from his acts and the circumstances.' Hano v. Bigelow, 155 Mass. 341, 29 N. E. 628."

The court concludes the opinion with the statement that:

"In our view of the case, the covenant in question, construed in connection with the surrounding circumstances, creates a valid restriction limiting the use of the property in this district to single residences."

In the case of Austin v. Richardson (1926, Texas) 278 S. W. 513, the Court of Civil Appeals of Texas held that the courts favor creation of restricted residential districts in cities. In that case an addition was platted and the same was placed on the market for sale with the general plan and intention of making the same an exclusive residential district for private homes only, and expensive private residences were erected, used, occupied, and enjoyed as homes. It was there attempted to convert a residence into an apartment house, which it was contended was in violation of restrictive covenants. In that case the court said:

"2. The courts recognize with favor that people may laudably desire to create restricted residence districts where they may enjoy

home life apart from any class of business environments. There are so many arguments in favor of such a reasonable and laudable purpose that we will not undertake any extended discussion thereupon. San Antonions are proud of their beautiful city, its parks, its clean rivers, its beautiful homes and residential and restricted districts, where people desire to come in neighborly contact with others of like tastes, away from the suggestion of business care and commercialism, and where, having finished for the day their downtown busy cares and worries, they may turn to the beauties and delights of the privacy of home life, and the inspiring joys that one enjoys in his private castle, and the law favors them. Wilson v. Gordon (Tex. Civ. App.) 224 S. W. 703; Curlee v. Walker, 112 Tex. 40, 244 S. W. 497; Oliver et al. v. Forney Cotton Oil and Ginning Company (Tex. Civ. App.) 226 S. W. 1094; Bolin v. Tyrol Investment Company, 178 Mo. App. 1, 160 S. W. 588, 164 S. W. 259; Id., 273 Mo. 257, 200 S. W. 1059, L. R. A. 1918-C. 869; Morrison v. Darr (Mo. Sup.) 201 S. W. 1147."

The Supreme Court of Arizona cites a covenant in a deed in which the following restriction was imposed:

"Only one residence shall be erected on any one of said lots." Ainsworth v. Elder, 40 Ariz. 71, 9 P. (2d) 1007.

That lot was part of a platted addition which had been laid out and platted as a choice and attractive residential district. That court said:

"Most of the early decisions construing covenants restrictive of the use of land have been based on the fundamental theory that an owner of realty was entitled to deal with it as he pleased, and, therefore, any restrictions on its use were most rigidly and strictly construed, and, indeed, the courts frequently exercised considerable ingenuity in limiting their application. As time has gone on, however, it is realized that, especially in a crowded community, the manner of use of one piece of land directly and greatly affects the value and use of adjoining and nearby premises, and the later cases incline towards giving more and more weight to the doctrine of sic utere tuo ut alienum non laedes. For this reason it is now generally held courts should consider not only the strict and technical meaning of the particular words of restriction, but also the surrounding circumstances, the general purpose of the restrictions and the manner in which they have been interpreted by the property owners" 9 P. (2d) at page 1008.

"It is a well known fact of which this court cannot but take judicial notice, that many families desire to own homes for residence purposes which shall be distinct and separate from residences occupied by other families, and that there is a strong and growing tendency everywhere to set aside special districts to be used exclusively for such purposes. The various zoning ordinances being adopted so numerously all over the country recognizes clearly that the old system of two classes only—one for living, the other for business purposes—is insufficient to meet the present situation, and most of these ordinances recognize now four fundamental divisions, to wit, manufacturing and wholesale business; retail business; community residence (which generally includes apartment houses, lodging houses and duplexes), and strictly residence, which is invariably limited to single private dwelling houses, planned for and occupied by one family only. While special situations call for modifications of and exceptions to these classifications, the general principle prevails, and we think it is a commonly known and accepted fact that the term 'residence district' is understood, in the absence of some limitation in the particular case, express or implied, to apply to districts where only single private family residences or dwelling houses are permitted, and that a building in such a district which is intended for and allows occupancy by more than one family is not within the common acceptation of the words 'one residence'." 9 P. (2d) at page 1009.

The Supreme Court of Tennessee in the case of Laughlin v. Wagner, 146 Tenn. 647, 244 S. W. 475, also considered a restriction which had been inserted in a deed in a tract which had been platted "for residence purposes only."

The grantee owned a vacant restricted lot and contiguous thereto an unrestricted lot on which he operated a drug store. He desired to pave and use the restricted lot for a driveway appurtenant to his drug store. That court held this was in violation of the residential purpose clause and enjoined the grantee from violating the restrictive covenant.

The court said:

"Unquestionably it is an established rule of law that a person owning a body of land may sell portions thereof and make restrictions as to its use for the benefit of himself as well as those to whom he sells other portions of the land, and he may invoke the remedy of injunction to prevent a violation of the same, in proper cases, provided, of course, the restriction is not against some public violation. There is certainly good reason in this rule when applied to the common practice of inserting in deeds a restriction such as tends to create a residential section against those uses which would tend to mar the beauty and detract from the value of the property by uses inconsistent with the uses intended. In such deeds the grantee does not acquire an absolute and unqualified title, but it is a part of the title

which he accepts, that the use of the land shall be limited and be restricted in use as provided by the deed. 13 Cyc. 718; 7 R. C. L. 1114; Pomeroy's Equity, vol. 2, sec. 1695.

"* * * Another defense is that the growth of the city and development of business in that section has been such as that the enforcement of this restrictive clause would be inequitable. The principle involved in this defense has been recognized by the courts in those cases where the development of the business has had the effect to destroy the very purpose of the restriction, and the proposed use of the property would in no way inure to the benefit of the other property. Delvin on Deeds, sec. 991-C.

"But the facts in this case do not justify the application of that doctrine. It does not appear that there had been such encroachments in the vicinity of this property as that the use of this lot for the purposes aforesaid would not materially affect the value or the use for residential purposes of the remaining portions of the land.

"The restrictive clause in this deed being valid and not contrary to public policy (Devlin on Deeds, sec. 991-B), and enforceable in equity by the original grantor and by property owners who purchased other property from him in the vicinity who hold their property largely under similar restrictive clauses, it remains to apply the rule to the situation shown to exist.

"* * *From this interpretation it follows that the Belvedere side of this lot could not be made use of in such a way as that the manifest purpose would be to serve the business houses adjacent to it. For example, it could not be used as affording an intentional passageway or entrance into the business house. **Any structure, whether strictly a house or not, such as a concrete driveway, which devotes the use of the property to the carrying on of a business, would be violative of this clause.** But the use of the lot for decorative purposes, such as flower beds or as a walkway on the lot itself, would not violate the manifest intent and purpose of this clause.

"In other words, any use of this lot which might be reasonably incident to its use for residential purposes is permissible, but it is not permissible to put the lot into service as an incident to the business houses on the adjacent portion of the lot." (Emphasis ours.)

Berry in Restrictions on Use of Real Property, in section 34, page 52, announces the following rule:

"Sec. 34. **Generally.** The primary rule for the interpretation of restrictive covenants is to gather the intention of the parties from their words, by reading, not simply a single clause of the agreement, but the entire context, and, where the meaning is doubtful, by considering such surrounding circumstances as they are presumed to have considered when their minds met. Clark v. Devoe, 124 N. Y. 120, 26 N. E. 275, 21 Am. St. Rep. 652 (1891); Empire Bridge Co. v. Larkin Soap Co., 59 N. Y. Misc. 46, 109 N. Y. Supp. 1062 (1908); Jamison v. McCredy, 5 Watts & S. (Pa.) 129 (1843)."

Also, in section 37, at page 57, the author states as follows:

"* * * Nevertheless, proper building restrictions and other limitations on the use of property of a character which the law permits to be attached to land, in such a sense as to restrict the use of one parcel thereof in favor of another, will be enforced in a proper case in courts of equity upon equitable grounds in favor of or against the party designed to be benefited or burdened thereby. Scharer v. Pantler, 127 Mo. App. 433, 105 S. W. 668 (1907)."

In the case of Bachman et ux. v. Colpaert Realty Corporation et al. (Ind.) 194 N. E. 783, the Appellate Court of Indiana considered a restrictive covenant prohibiting the use of any building which might be erected on the premises for any business or trade, and held that such a covenant must be presumed to include the use of the lot for any prohibited uses so as to make the restriction effective in carrying out the general plan of development. In that case the court held that an examination of the deed in its entirety in the light of facts found by the trial court clearly disclosed an intention on the part of the original owner to carry out a preconceived and established plan of making the addition a desirable residential area. The defendant attempted to erect a filling station, and one of the restrictions was as follows:

"2. That the grantees, their heirs, administrators or assigns shall not use or permit to be used any building which may be erected on said premises for the purpose of a grocery store or any business or trade."

In that case it was contended that the restrictions which prevented the use of any building which might be erected on said premises for any business or trade did not prohibit the erection of any kind of structure for the use of a filling station.

That court, in discussing the use of the lot itself outside a building for gasoline and oil business, held that it would conflict with the general plan of development as much, if not more than the use of a building on the lot for such gasoline and oil business, and that it would deprive the restrictions of all beneficial force. The court on that question said:

"We must presume that the parties to the deed intended that the restriction be effec-

tive in carrying out said general plan of development. When we presume that, we must presume that they intended to prohibit the use of the lot, for any of the prohibited uses. Pierce v. St. Louis Union Trust Co., supra; Holderness v. Central States Fin. Corp. (1928) 241 Mich. 604, 217 N. W. 764 Baumert v. Malkin (1923) 235 N. Y. 115, 139 N. E. 210."

That court also quotes with approval the rule as announced in the case of Couch v. Southern Methodist University (Tex. Civ. App. 1926) 290 S. W. 256, 259, concerning the negative equitable easement rule, as follows:

"It may be stated generally that, where a common grantor opens up a tract of land to be sold in lots and blocks, and, before any lots are sold, inaugurates a general scheme of improvement for such entire tract intended to enhance the value of each lot, and each lot, subsequently sold by such grantor, is made subject to such scheme of improvement, there is created and annexed to the entire tract what is termed a negative equitable easement, in which the several purchasers of lots have an interest, and between whom there exists mutuality of covenant and consideration"

—and cites the following cases: Wiegman v. Kusel (1915) 270 Ill. 520, 110 N. E. 884; Abbott v. Steigman (1928) 263 Mass. 585, 161 N. E. 596; Storey et al. v. Brush (1926) 256 Mass. 101, 152 N. E. 225.

In the case of Holderness et al. v. Central States Finance Corporation et al., 241 Mich. 604, 217 N. W. 764, the Supreme Court of Michigan considered an action to restrain certain defendants from violating building restrictions. Uniform building restrictions had been embodied in each conveyance given by the orginal owner of the plat. The restrictions in substance limited the construction of buildings on lots to those for dwelling house purposes. It was the claim of the defendants that the restrictions pertained only to the character of the building that might be erected on any particular site and that such restrictions did not limit the use which might be made of such buildings. The restrictions read in part as follows:

"* * * Except for dwelling house purposes only * * * having at least two stories in height and appurtenant outbuildings or an approved type of bungalow."

The question for determination was whether such restriction applied only to the character of the building to be erected on the lot or whether it also controlled the use which might be made of the building. In that case the court said:

"In placing a proper construction upon these restrictions, if there can be said to be any doubt about their exact meaning, we must have in mind the subdivider's intention and purpose. Weiss v. Zack, 237 Mich. 10, 211 N. W. 90. The restrictions in question must be read as a whole and construed in the light of the general plan under which the restrictive district was platted and developed. Tabern v. Gates, 231 Mich. 581, 204 N. W. 698. In light of the fact that these restrictions have been uniformly embodied by the subdivider in his conveyance of each lot, and the admission of these defendants that the whole development of the addition has been in conformity to the restrictions, it would be a perversion of the English language to hold that the restrictions applied only as 'building restrictions' and not as restrictions governing the use of the property. It would indeed be useless to provide that 'no structure shall be built on any lot except for dwelling house purposes' and then permit it to be used forthwith as a store or factory. The restriction applicable to the very street on which defendant's property is located is clearly intended to confine it to the better class of residence property, since it limits the character of residences which may be erected thereon to single houses, double houses, duplex or two family flats, and also fixes a minimum cost. In addition to this, we find an express provision that the 'lots fronting on Grand River Avenue may be used for business purposes,' the plain inference being that the lots as to which this provision does not apply shall not be used for business purposes. We are of the opinion that the intention of the subdivider is easily ascertained from the language uniformly used in the instruments by which he conveyed the lots in the subdivision. The restrictions have been enforced, and both the development and use of the property have conformed thereto. The provision must be held to be a restriction controlling the use, as well as the character of building to be erected. Any other construction deprives the provision of all beneficial force and would be a mere evasion. Dorr v. Harrahan, 101 Mass. 531, 3 Am. Rep. 398. Decent regard for the rights of other owners as well as the mandate of law require the defendants to observe the restriction as to the use of their dwelling. The decree of the lower court is affirmed, with costs to the appellee."

It may be difficult to define with exactness a rig for the drilling of an oil and gas well. The modern oil derrick, as we see it from our windows at the State Capitol, constitutes the erection of a steel derrick towering something like 125 feet in the air with its incidental requirements, with footings deeply incased in cement. It stands directly over the point which was staked for the location of the well. The ground is removed under the site of the derrick for a deep and costly "cellar" made of concrete sides, top

and bottom with the concrete steps descending to the bottom. If such a construction were erected on the top of the ground, no one could contend that it was not in the nature of a building. In fact, at times a part of the derrick is boxed up or enclosed. The industry has developed a number of words and phrases. "Driller," being the individual who superintends work on the derrick floor of a rotary rig; oftentimes there are four of these men known as firemen or potmen, derrickmen, two floormen and "rig builders." It is the history of the Oklahoma City field that where oil and gas is found the derricks remain, although reduced in height, over the well for a long period of time. Oil was discovered in the Oklahoma City field in 1928; the derricks still stand; the cellar pits are there; and the derrick floors are there. The terms "boilerhouse," "derrick floors," "rig builders," "pits and cellars," indicate something in the nature of a building, or which calls for a building, placed over the location where the well is to be drilled. Certainly it seems that if the right is given to erect a derrick and place thereon pipes, tanks, boilers, etc., on a lot for the use of drilling, then the corresponding right can be demanded to protect this property by the erection of buildings or houses to cover the same, and if that is done, it is manifestly a violation of the spirit, intent, purpose, and plain wording of the restrictions. But it seems unnecessary to adopt this fine distinction. The restrictions themselves are sufficient to prohibit the drilling of an oil and gas well on the premises in question.

Such structures, rigs, cellars, derrick floors, boilerhouses, may be of modern construction, many times in excess of the cost of these residences, but they are not in keeping with the surroundings as required by the plat restrictions. What are the surroundings? The answer is admitted, and direct—sites, which have been used and are now being used for residential building sites imposed by plat restrictions for residential purposes. The block in question was burdened with that direct and positive restriction. No one at this late day could be misled as to the general appearance and character of this tract, and the nature of the homes which have been erected; that general appearance is sought to be set aside and disregarded by the defendants. All of these facts ought to indicate the general restrictive character of the tract in question to any one seeking an interest therein, and be strong constructive notice that the grantors and grantees sold and purchased with a dominant purpose for the common benefit of each that the building sites should never be used or occupied except for that of residence exclusively. The fact that the property may have become valuable for oil and gas purposes is immaterial unless the property is no longer considered residence property. That condition does not prevail, for the platted area has been devoted to residential purposes, and the "call of Mammon makes no appeal to equity." Ludgate v. Somerville (Ore.) 256 P. 1045; Miles v. Clark (Hollingsworth) (Cal. App.) 187 P. 171.

To permit defendant to drill an oil and gas well on the block in question would be putting the lot into a service and use entirely inconsistent with residential purposes, and the residential restriction would be deprived of all beneficial force. The defendant comes into a court of equity. He sees that the area was developed as a residential district, a choice section of Oklahoma City, and now seeks to subvert the character of a residential building site to a site for a commercial enterprise through strict and technical interpretations of restrictions without regard to a view of all the circumstances which brought about the development of this residential district. To my mind it is like the Supreme Court of Michigan said in the Holderness Case, supra, "a perversion of the English language" to hold that the restrictions do not apply to the drilling of an oil and gas well. Such a contention makes no appeal to my equitable conscience.

For the foregoing reasons, I respectfully dissent.

I am authorized to state that Mr. Justice BAYLESS and Mr. Justice GIBSON concur in this dissent.